[No. 38648.    Department One.    February 20, 1967.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES EDWARD
JACKSON, *Appellant.*\*

*F. Gwynn Townes,* for appellant (Appointed counsel for
appeal).

*Charles O. Carroll* and *David W. Soukup,* for respondent.

HALE, J.—Defendant opens his brief with the statement
that a storekeeper and a shoplifter are natural enemies,
suggesting perhaps an inexorable law of nature governing
their relationship rather than the mundane rules which

\*Reported in 424 P.2d 313.

forbid not only shoplifting but flight and assault as well. If, as appellant implies, merchants and shoplifters are indeed natural enemies, one sure way for them to become friends is for the shoplifter to renounce his calling and become a paying customer.

Charged by information with assault in the second degree committed September 4, 1965, defendant appeals a judgment and sentence of conviction entered on a jury's verdict of guilty. He levels his main arguments against the sufficiency of the evidence, raising the point in discussing the instructions.

For 19 years, Clifton J. Tennant had kept open his Tennant's Sportswear Shop at 605 Broadway East in Seattle. One afternoon, while alone in the store waiting on customers, he noticed the defendant enter and go to a rack which held a number of sport coats for sale. He saw the defendant select a coat, walk into the dressing room and heard the door of the dressing room click shut. Accustomed to seeing his customers try on sport coats outside the dressing room, Tennant thought defendant's actions rather peculiar. Four or five minutes later, wondering why defendant had not yet emerged from the dressing room, Mr. Tennant waited at a counter past which the defendant would have to walk.

Shortly thereafter, defendant, with hat on and dark overcoat buttoned, walked out of the dressing room, handed Mr. Tennant a sport coat on a hanger, and said, "I'm sorry, this does not fit," and left the store. Mr. Tennant took the coat to the rack and noticed that a sport coat with a checked pattern which he had shown to customers about 20 minutes earlier was gone. He went to the front door and looked down the street to see the defendant less than one-half block away, walking south on Broadway away from the store.

Delayed a minute or two in finding someone to mind the store, Mr. Tennant overtook defendant at the corner of Broadway and Mercer and observed a distinct bulge under his raincoat. Tennant testified that

> I put my hand on his shoulder. I said, "Sir, I would like to see what you have under your coat." . . . [H]e tried to poke at me with that hand and told me, he said, "If you don't leave me alone you are going to get hurt," . . . . Well, at that time his right hand had been in his pocket and he pulled that out of his pocket with the knife. . . . The knife was open . . . . Well, he kept stabbing at me, and I attempting to grab his right hand which held the knife to stop him. . . . At the moment I didn't realize it. Yes, he did. He hit me once in the nose and twice on the lip, but at the moment, in the excitement of the thing, I didn't know I had been cut. . . . Well, later the blood started running down into my mouth and I knew I had been hit . . . .

They wrestled, defendant fell to the ground, got up and walked away with knife still in hand, and Tennant followed closely—keeping within a few feet of him until defendant walked between some houses from which there was no exit save past Tennant.

Tennant testified concerning defendant that, at this juncture,

> He still had the knife in his hand, and he was bleeding too at this point, which I noticed. Evidently when I wrestled him to the ground, he had cut his own hand on the knife.

After Tennant had backed defendant into the cul-de-sac between the two houses, he picked up a broomstick and held defendant at bay until the police arrived. The police took the knife away from defendant and, on opening his raincoat, found the sport coat, still on its hanger tucked into defendant's trousers.

Defendant gave a different version of the affray. He admitted that he stole the sport coat but denies assaulting Tennant with a knife. He testified that he got a block away from the store with the sport coat concealed under his buttoned raincoat and

> I had this pen knife shaving my nail, getting a sliver out of it, it was underneath there, and this gentleman, I didn't know who he was at the time, I didn't recognize him, I never recognized him in the store, and he started pounding on me, and I held up my hand to hold him off

but he keeps coming in, and pretty soon he comes in, the blade folds on my hand, we go down, the man is still beating on me, and, finally, I get up, I told him, I says, "You have already made me cut my hand. What do you want from me?"

He testified that he had not drawn the knife against Mr. Tennant, had not struck him or cut him with it, had been drinking heavily and cut himself in the hand when Tennant knocked him to the ground. He said that he did not resist Tennant's attempt to recapture the sport coat, but merely asked him to desist his attack for a few moments so that they could find a secluded spot where he could surrender the coat and "could keep from getting picked up for lewdness or something, indecent exposure."

The information charged defendant under RCW 9.11-.020(3), (4), with assault in the second degree in two particulars: assaulting Clif J. Tennant with a weapon or thing likely to produce harm, and willfully inflicting grievous bodily harm upon Clif J. Tennant.

Defendant offers a theory that the facts, as a matter of law, showed that he acted in self-defense in warding off Tennant's attack; that even if the defendant's actions are regarded in the worst light possible, they show no more than assault in the third degree and preclude as a matter of law the offense of assault in the second degree; and that the court erred in failing to charge assault in the third degree as a lesser included offense.

Concerning the weapon, he refers to RCW 9.95.040 to support the idea that a knife less than 3 inches long is not a deadly weapon.

■ On this point, we note that the knife blade held by defendant during his struggle with Tennant was more than 2 but less than 3 inches long. RCW 9.95.040, in pertinent part, reads:

The following limitations are placed on the board of prison terms and paroles with regard to fixing the duration of confinement in certain cases, notwithstanding any provisions of law specifying a lesser sentence, to wit:

(1) For a person not previously convicted of a felony but armed with a deadly weapon at the time of the

commission of his offense, the duration of confinement shall not be fixed at less than five years.

. . . .

The words "deadly weapon," as used in this section include, but are not limited to, any instrument known as a blackjack, sling shot, billy, sand club, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than three inches, any razor with an unguarded blade, and any metal pipe or bar used or intended to be used as a club, any explosive, and any weapon containing poisonous or injurious gas.

RCW 9.95.040 is an enactment addressed specifically to the Board of Prison Terms and Paroles and not to the courts. It sets forth certain factors which must be considered by the board in fixing minimal terms of confinement. Other than any peripheral effect it may have on judicial reasoning, the statute has nothing to do with the definition of crimes. See, also, *State v. Coma,* 69 Wn.2d 177, 417 P.2d 853 (1966).

■ Elsewhere in another statute, the legislature, acting within its constitutional powers, has defined assault in the second degree, *inter alia,* as follows:

Every person who, under circumstances not amounting to assault in the first degree [RCW 9.11.010]—

. . . .

(3) Shall wilfully inflict grievous bodily harm upon another with or without a weapon; or

(4) Shall wilfully assault another with a weapon or other instrument or thing likely to produce bodily harm; or

. . . .

Shall be guilty of assault in the second degree and be punished by imprisonment in the state penitentiary for not more than ten years or by a fine of not more than one thousand dollars, or by both. RCW 9.11.020(3), (4).

Thus, under RCW 9.11.020, one need not be armed with a *deadly* weapon to commit second-degree assault; any instrument likely to produce bodily harm will suffice. Accordingly, when defendant used his knife in a threatening

and menacing manner in such a way as to show his present intentions to attack another with it, he willfully assaulted another with a weapon, instrument or thing likely to produce bodily harm under RCW 9.11.020(4), *supra*. And stabbing a person two or three times in the face with such a knife, even though the wounds so inflicted may later, from a medical standpoint, appear not serious, constituted a willful infliction of grievous bodily harm under RCW 9.11.020(3), *supra*, both of which constitute assault in the second degree. The evidence amply supports the jury verdict under the statutory definition of assault in the second degree.

■ As to the court's duty to include third-degree assault as a lesser offense, the evidence showed that at all times during the affray and pursuit, defendant carried the knife in his hand. There was no evidence, therefore, upon which the court could authorize the jury to find third-degree assault as a lesser included offense. We reiterated this in *State v. Emerson*, 19 Wn.2d 700, 144 P.2d 262 (1943), as follows:

> " ' . . . In law, assault in the third degree is included within a charge of assault in the second degree, *but where a defendant is charged with assault in the second degree, the question whether he is guilty of assault in the third degree should not be submitted to the jury unless the facts of the particular case are such that they will sustain a conviction of assault in the third degree.*' "

■ Defendant also assigns error to the court's failure to give certain instructions. At trial, defendant neither objected to any of the instructions proposed, nor proposed any instructions, nor excepted to the court's giving or refusal to give any requested instructions. Thus, we do not have before us for review any claimed errors arising from the instructions or lack of them. We ought not and will not consider on appeal errors claimed in the instructions unless the trial court has had an opportunity to pass upon the asserted errors and had a chance to make corrections. *State v. Louie*, 68 Wn.2d 304, 413 P.2d 7 (1966); *State v. Harris*,

62 Wn.2d 858, 385 P.2d 18 (1963); and *State v. Browder*, 61 Wn.2d 300, 378 P.2d 295 (1963).

Affirmed.

HILL, WEAVER, ROSELLINI, and HUNTER, JJ., concur.